Filed 3/24/26  P. v. Shaw CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D084236 |
| Plaintiff and Respondent, | (Super. Ct. No. SCD296802) |
| v. | |
| PATRICK ISAIAH SHAW, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Francis M. Devaney, Judge.  Affirmed.

Jared G. Coleman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Steve Oetting and Heather B. Arambarri, Deputy Attorneys General, for Plaintiff and Respondent.


A jury convicted Patrick Isaiah Shaw of numerous offenses, including one count of torture and multiple counts of domestic violence resulting in corporal injury, involving two separate victims.  The trial court sentenced

Shaw to life in prison with the possibility of parole and a determinate term of 13 years and four months.

On appeal from the judgment, Shaw argues the trial court erred in denying his request for self-representation, and in failing to stay the punishment for either the torture conviction or one of the domestic violence convictions under Penal Code section 654.[1]  As we shall explain, we conclude that because Shaw's request to represent himself was equivocal, the trial court's denial was proper.  We also reject Shaw's contention that the court erred by failing to stay punishment under section 654.  Accordingly, we affirm the judgment of conviction.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Prosecution Case*

1. *Janet Roe*

In January 2022, Shaw and Janet Roe met through Facebook when Shaw asked Roe if she could braid his hair.  Thereafter, they began hanging out and occasionally had sex.  Sometime in February, Roe suffered a severe broken left ankle, requiring her to wear an orthopedic boot and use crutches.

Around 7:00 p.m. on April 17, 2022, Shaw picked Roe up at her house and drove her to a drugstore.  Because Roe was still in the orthopedic boot, she sat in the back seat of Shaw's car.  After Roe returned from the drugstore to Shaw's car, Shaw was agitated and confrontational, so Roe asked him to take her home.  Shaw refused and drove in an erratic manner away from Roe's house.  Roe then told Shaw she did not want to continue a relationship

---

[1]     Subsequent undesignated statutory references are to the Penal Code.

with him, which enraged Shaw further. Shaw drove onto the freeway, heading farther away from Roe's house.

Roe's daughter, J.H., called Roe while she was in Shaw's car. J.H. heard Shaw yell, "We're going somewhere, but you're not going home." Roe told J.H. that Shaw was driving in the wrong direction. Shaw then exited the freeway, parked behind a grocery store, and ordered Roe to get off the phone with J.H. Roe refused to end the phone call because she did not feel safe and wanted J.H. to hear what was happening. Shaw then got out of the car, walked around to the passenger side, opened the door, punched Roe in the head and grabbed Roe's phone. He threw the phone on the ground, breaking it, and continued to assault Roe by punching her in the head and face. A bystander at a nearby apartment yelled for Shaw to take his hands off Roe and threatened to call the police. Shaw yelled back at the person to mind his own business and told Roe, "I am really going to beat your ass now."

Roe tried to protect herself with her hands and her right leg. She felt like she could not escape because it was dark, she was disabled, and Shaw had broken her phone. When Shaw finally stopped the assault, he returned to the driver's seat and drove back onto the freeway. Shaw continued to yell at Roe, calling her names and threatening to hurt her again. Shaw exited the freeway and parked his car at an empty park. He got out of the car and resumed assaulting Roe, repeatedly punching her body and head. Shaw took Roe's boot off and threatened to rebreak her ankle. As Roe tried to defend herself with her right arm, Shaw hit her hand so hard that one of Roe's veins ruptured, causing blood to spray inside the car. Shaw then retrieved a phone charging cord from the car, dragged Roe out of the car, and began whipping her back, legs, stomach and neck with the cord. Roe crawled back into the car in an attempt to protect herself. Shaw then got back into the driver's seat

3

and drove away from the park, threatening to kill Roe and bury her in the desert.

Roe realized that she had to escape and when Shaw stopped at a red light, she got out of the car and tried to get another driver to help her. A ride share driver approached Roe and told her to get into his car. He took Roe to a bar where Roe was able to call a friend to get a ride home.

Two days later, Roe went to the hospital. Medical staff noted Roe had significant bruising all over her body, swelling in her broken ankle, and she was suffering from headaches. The staff suspected Roe had been beaten and told Roe they would notify the police.

2. *Jane Doe*

Around August 2022, Doe met Shaw through an online dating website and they began seeing each other. Within a month, however, Shaw began threatening and physically abusing Doe. The abuse escalated on October 9, when Shaw picked Doe up from her house, where Doe lived with her mother and her mother's boyfriend, so the couple could spend time together during Shaw's shift as a security guard. On the way to Shaw's job site, he became verbally abusive. Doe asked Shaw to take her home, but he refused, beginning a week-long ordeal of abuse.

During the week, Doe and Shaw spent some nights sleeping in Shaw's car and other nights sleeping in motel rooms. Over that time, Shaw physically abused and threatened Doe. On October 16, Doe finally sent a text to her brothers asking for help. Doe's brothers called law enforcement and met a sheriff's deputy in the parking lot of Shaw's worksite where his car was parked.

Doe did not disclose the abuse to the police because she feared retribution by Shaw, who had warned her to lie and say that bruises on her

4

face were caused by falling in the shower and not by him. Doe did leave with her brothers and mother, and the following day obtained a temporary domestic violence restraining order against Shaw. Doe was not able to serve the order on Shaw, which was required to seek a permanent restraining order, but returned to court on November 3, 2022, to extend the temporary order.

That same night, however, Doe let Shaw sneak into her bedroom at her mother's house, which began another extended episode of abuse. During this encounter, Doe initially consented to having sex with Shaw, but he became too rough and she asked him to stop. Shaw refused and continued to penetrate Doe until he ejaculated. The following morning, Doe sought medical attention because she was in pain and experiencing vaginal bleeding. The doctor who examined Doe concluded she suffered two vaginal lacerations.

The next evening, on November 4, 2022, Doe left her house around 10:30 p.m. to go to a convenience store and saw Shaw pull into her driveway. Shaw yelled at Doe to get in his car and threatened to kill her mother and her mother's boyfriend if she did not comply. Doe believed Shaw's threats and got into the car. Shaw drove to a residential area and parked the car. After parking the car, Shaw ordered Doe into the back seat and told her to take off her clothes. Doe complied because she was afraid of Shaw.

Shaw then got into the back seat and forced Doe to have sex with him. Doe was crying in pain and kept asking him to stop. Shaw told her to shut up and held her face down on the back seat. Afterwards, because of injuries caused by the rape, Doe bled through the shorts she was wearing.

While Shaw and Doe were still sitting in the parked car, Doe received several phones calls from her ex-girlfriend, V.R. Shaw accused Doe of being in a sexual relationship with V.R. and when Doe tried to assure Shaw this

was not true, Shaw accused Doe of lying and physically assaulted her. He slapped her, slammed his head into hers, struck her arm several times, and punched her in the mouth and eye. Shaw told Doe that he was going to kill her and he wanted her money. He also demanded that Doe give him her social security number.

Around 12:30 a.m., Shaw drove Doe to a park. He took her phone and began scrolling through her photos. When he came across some old photos of Doe with V.R., he erupted in anger again. He physically assaulted Doe, punching her multiple times in the face and pelvic area. He eventually stopped hitting Doe and fell asleep in the back seat of the car with her.

The following morning, on November 5, 2022, they drove to Shaw's work. Shaw left Doe in the parked car during the day and warned her that he would beat her if she did not keep her head down. Doe testified she tried to contact a domestic violence hotline but could not get through to anyone. After Shaw's shift ended, he drove Doe to get some fast food and a bag of ice for her swollen face, and then they checked into a motel.

A few hours later, Shaw told Doe to clean herself up and lay down naked on the bed. Doe again complied. Shaw laid down naked next to Doe, grabbed her by the hair, forced her head down toward his penis, and ordered her to orally copulate him. Doe complied out of fear, crying in pain throughout because of the cuts on her mouth from Shaw beating her face. Afterwards, Doe rinsed her mouth and went to sleep.

The next morning, on November 6, 2022, Shaw elbowed Doe in the side and punched her shoulder. After this, while Doe was lying on the bed, Shaw got on top of her and ordered Doe to have sex with him. Doe did not comply this time and Shaw became angry. Shaw demanded Doe remove a necklace and bracelet she was wearing and threatened to beat her if she did not

6

comply. While Doe tried to remove the bracelet, Shaw ripped the necklace from her neck. Shaw then started prying Doe's acrylic fingernails from her fingers. He pulled each acrylic nail so that it either separated from Doe's nails or removed the nail bed completely, causing her fingers to bleed. Doe experienced excruciating pain and begged Shaw to stop. Shaw threatened to beat her if she did not stop screaming and continued pulling up her acrylic nails until they were all off.

After ripping off Doe's fingernails, Shaw demanded she braid his hair. When Doe told him that she could not do this because of the injuries to her fingers, Shaw became angrier and more aggressive, accusing Doe of "acting up" and being ungrateful. Shaw forced Doe into the bathroom and punched her several times, then dragged her into the bedroom and continued punching her all over her body.

Around noon that day, Shaw took Doe to a fast food restaurant and then had her reserve a different motel room. While at the restaurant, Doe went to the bathroom and texted V.R. that Shaw had tortured her by ripping off her fingernails. She asked V.R. to contact the police and Doe's mother, and told V.R. what motel she was going to after the restaurant.

V.R. called Doe's mother and the two of them drove to the area where they believed Doe was. V.R. also called the police who arrived at the motel and arrested Shaw.

B. *Defense Case*

Shaw testified in his own defense. He told the jury he met Doe through an online dating website in August 2022 and met with her once or twice per week for the next few months. Their meetups did not always involve sex, but they occasionally met at a hotel room for that purpose.

7

On November 4, 2022, Doe called Shaw several times while he was working. After his shift ended, Shaw had car trouble and took his car to a friend to repair it. While the car was being repaired, Doe called Shaw and asked him to pick her up. When Shaw arrived at Doe's house, between 10:30 and 11:00 p.m., she was outside and walking toward his car. He testified Doe was "banged up" and had broken nails, so he offered to get her some ice or take her to the hospital, but Doe declined. Doe told Shaw that she was injured during a fight with her roommates. Shaw drove Doe to a hotel, but because Doe could not pay for the room and Shaw had to work early the next morning, they decided to sleep in Shaw's car.

The next day, on November 5, 2022, Shaw went to work, and Doe stayed in his car during his shift. Shaw gave Doe a pair of his sweatpants to wear. He texted with Doe throughout the day and came back to the car on his lunch break to bring her bandages for her nails. After Shaw's shift ended, he and Doe got fast food and went to a motel for the night. On November 6, 2022, Doe woke Shaw and they had sex. Shaw took the day off work and drove Doe to another motel. When he walked into the lobby, he was arrested.

Shaw testified that all of his interactions with Doe were consensual, and he denied forcing Doe to engage in any sexual acts with him. He told the jury he felt "a lot of love" for Doe and admitted he had described their sexual encounters to police as "great, amazing porn-star shit."

Shaw testified that he met Roe in January 2022 and had a sexual relationship with her for a few months. He stated that on April 17, 2022, he picked Roe up from her apartment and drove her first to a drugstore and then to a grocery store. They got into an argument and Roe began acting strangely. Shaw told the jury he left Roe, unharmed, in the parking lot of the grocery store. Roe called Shaw, but he told her that he was heading home

8

because he did not want to argue with her. Shaw said all of his sexual interactions with Roe were consensual.

C. *Verdict & Sentencing*

Before trial, the San Diego County District Attorney filed an amended information charging Shaw with torture (§ 206; count 1), two counts of kidnapping (§ 207, subd. (a)); counts 2 & 10), two counts of forcible rape (§ 261, subd. (a)(2); counts 3 & 4), forcible oral copulation (§ 287, subd. (c)(2)(A); count 5), two counts of domestic violence resulting in corporal injury (§ 273.5, subd. (a); counts 6 & 12), two counts making criminal threats (§ 422; counts 7 & 15), intimidating or dissuading a witness (§ 136.1, subd. (a)(2); count 8), violating a protective or restraining order (§ 273.6, subd. (a); count 9), assault with a deadly weapon (§ 245, subd. (a)(1); count 11), battery causing serious bodily injury (§ 243, subd. (d); count 13), and assault by means likely to produce great bodily injury (§ 245, subd. (a)(4); count 14). Counts 1 through 9 related to Doe and counts 10 through 15 related to Roe. As to all but count 6, the amended information alleged the victim was a person defined in Family Code section 6211 (§ 1203.097, subd. (a)); as to counts 1, 2, 6, 11, 12 and 14, the information alleged Shaw inflicted great bodily injury under circumstances involving domestic violence (§ 12022.7, subd. (e)); as to count 3, the information alleged the offense qualified for sentencing under the One Strike Law (§ 667.61, subds. (b), (c) & (e)); and as to count 13, the information alleged Shaw personally inflicted great bodily injury (§ 1192.7, subd. (c)(8)). The amended information further alleged Shaw had suffered one prior serious or violent felony conviction, subjecting him to sentencing under the Three Strikes law (§§ 667, subds. (b)–(i); 1170.12, subds. (a)–(d).) Finally, the amended information alleged four

9

aggravating factors (Cal. Rules of Court, rule 4.421(a)(1), (a)(6), (b)(1) & (b)(2)).

After the prosecution rested its case, Shaw filed a motion to dismiss pursuant to section 1118.1. The trial court granted the motion as to counts 9 and 13, and as to the section 12022.7, subdivision (e) allegations on counts 11, 12 and 14.

The jury found Shaw guilty on counts 1, 2, 6, 7, 8, 10, 11, 12, 14, and 15, and found true the enhancement allegations pertaining to each of those counts. The jury deadlocked on the rape, forcible oral copulation, and violation of restraining order charges (counts 3, 4 and 5), and the trial court dismissed those counts on its own motion. Thereafter, Shaw admitted the prior strike and serious felony conviction allegations and the court found true the aggravating factor allegations.

At the sentencing hearing, the trial court imposed an indeterminate sentence of life with the possibility of parole on count 1, plus a determinate sentence of 13 years and four months consisting of consecutive terms of three years for count 2; one year for count 6; eight months for count 7; two years for count 8; five years for count 10; one year for count 11; and eight months for count 15. The court stayed the sentences on count 12 and 14 pursuant to section 654 and dismissed the prior strike and serious felony allegations pursuant to section 1385.

Shaw timely appealed from the judgment of conviction.

DISCUSSION

I

Shaw contends the trial court violated his constitutional right to self-representation, as established by *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*), when it denied his request at a pretrial hearing 10 days before trial

10

began. The Attorney General concedes the trial court's stated reason for denying Shaw's request to represent himself—that the request was untimely—is not sufficient to uphold the denial. However, he argues this court should affirm because Shaw's request was not sufficiently unequivocal to invoke his right to try his case without counsel.

A

*Additional Background*

During the 18 months of pretrial proceedings, Shaw brought several motions under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*) seeking to replace his counsel. Shaw's first *Marsden* motion occurred at the preliminary hearing, and the trial court denied the motion. At that hearing, Shaw also requested that he be allowed to represent himself. The trial court denied the request, explaining that granting the motion at that stage of the proceedings would interfere with the witnesses and cause the preliminary hearing, which was in process, to take longer than necessary. The court, however, advised Shaw he could renew his request at a later time. On March 27, August 31, and November 6, 2023, Shaw made additional *Marsden* motions. The trial court conducted a hearing and denied each motion.

On January 25, 2024, Shaw again requested he be permitted to represent himself. This time, the court granted the request and relieved Shaw's appointed counsel, Shea Connelly. A month later, on February 26, 2024, Shaw told the court he no longer felt comfortable representing himself, but he did not want Connelly reinstated as his counsel. The court granted the withdrawal, reappointed Connelly, and permitted Shaw to make another *Marsden* motion. The trial court proceeded with the *Marsden* hearing and determined there was not an irreconcilable conflict between Shaw and Connelly. The court explained to Shaw that his accusations that Connelly

11

had lied to the court about the length of one of Connelly's visits with Shaw in jail were not accurate and were not sufficient to relieve Connelly. Further, the court explained that Connelly was an experienced public defender and that he was providing Shaw with excellent representation.

On April 11, 2024, at a pretrial conference, Shaw told the court he did not understand why his counsel was not planning to call his mother as a witness. Shaw stated his mother had "evidence pertaining to one of the alleged victims." Shaw also said Connelly was "not bringing [other witnesses] forward" and Connelly was not "relaying anything to me, and [he had] concerns moving towards trial about that." The court reminded Shaw his counsel was in charge of making such strategic decisions. The court also told Shaw it was not going to "have mini *Marsden* hearings every time I see you. … You are well represented, believe you me."

Shaw responded, "I'm going to continue talking because it's my rights being violated right now." The court and Shaw engaged in a tense exchange and the court expressed frustration with Shaw for being disrespectful. After telling Shaw, "Don't push me. Don't interrupt me. Don't mimic me," Shaw stated, "You're doing this, you're mimicking me." The court responded, "Mr. Shaw, I suggest you get back on the right foot with me. You can sit in that room and watch the thing through video if you ---" Shaw interrupted, "Or I can go pro per." The court responded, "You can go pro per, and you can end up with life in prison." Shaw retorted, "Which I won't. I won't."

The court then stated, "Mr. Shaw, this is your case. We've had this conversation. You went pro per when you first met me. I talked to you about it, and you agreed with me it was not a good idea. Now you're here raising that issue again. You've had numerous *Marsden* hearings. Mr. Connelly is well representing you, and he's trying. You need to cooperate with him as

much as he needs to cooperate with you. [¶] Now, if you have issues with him, talk in person, in private, not air in front of me and the prosecution. You know, this is the problem. If we're going to have a trial and you're going to be yelling and screaming in front of that jury, it's not going to go well. I want this case to go smoothly. I'm here to uphold your constitutional rights, so don't accuse me of violating them. My job is to uphold them. [¶] I'm going to give you a fair trial, but you need to cooperate. You're not the only person in this room with information about this case. Share it with Mr. Connelly and listen to him when he responds. If there are issues, I'll address them, but I'm not going to have them rudely raised every time I see you. [¶] Now, come on. I want to get your trial done and get it done fairly. So let's all be on the same page. You have issues with Mr. Connelly, he can talk to you in there, not in front of the district attorney and in front of me. [¶] Anything else?"

Shaw then stated Connelly had refused to "submit some motions for me." The court explained Connelly had submitted 19 motions on Shaw's behalf, some successfully. Shaw then asked if his counsel had filed a motion to dismiss, and the court explained Connelly had filed a section 995 motion, which was denied. Shaw then said repeatedly that Connelly should have filed additional 995 motions. When the court asked counsel if there was anything further, Shaw interjected and stated he wanted to represent himself since Connelly would not file another 995 motion "to prove [his] innocence." Shaw also stated he was ready to go to trial and would not waive any additional time. The court denied the motion, stating, "We have already invested lots of time on pretrial motions. We are ready to go to trial. It's too late for you all of sudden to take up a mantle to defend yourself. [¶] You are incapable [of] being ready to go to trial by April 22. I've already had this

13

conversation with you. You've already had numerous *Marsden* hearings. Mr. Shaw, you are in good hands. I've told you that. It's too late for you to get up to speed."

Shaw again repeated that he wanted to represent himself, and that he would tell this to the jury. Shaw further stated Connelly was not explaining why he would not call the witnesses Shaw wanted him to call or why he had not filed more motions. The court asked Connelly if he wanted to talk with Shaw privately, presumably to explain his strategy, and Shaw interjected that he did not want to talk to Connelly and that it was too late for them to reconcile. The court repeated its ruling denying Shaw's request to represent himself, and Shaw again repeated his request to do so several times before the court adjourned the hearing.

At the final pretrial conference on April 22, 2024, the day before trial began, the court considered whether the testimony of two of Shaw's experts should be limited because the experts had relied on or considered hearsay statements by Shaw's adoptive mother that his biological mother had abused alcohol while pregnant with Shaw. The prosecutor alleged that only this hearsay statement supported the experts' opinions that developmental disabilities that were recently diagnosed could have been the result of prenatal or postnatal alcohol syndrome. The court ruled that the experts could testify about the history of alcohol use by Shaw's biological mother during her pregnancy, but they could not relay the hearsay statements of Shaw's adoptive mother. After the court issued its ruling, the court reporter captured Shaw stating to Connelly, "What are you looking at me for, man? Look at the judge. … Stop trying to antagonize me." The court responded by asking Shaw if he was aware the court had ruled in his favor.

14

Shaw then stated Connelly was not doing his job and that he wanted Connelly to present evidence that the victims had consented to all of the conduct alleged in the case. Shaw stated Connelly was refusing to consider presenting nude photos Doe sent to Shaw, which Shaw asserted would prove his innocence. Shaw then said, "You should have fired him. You should have substituted him. … He's not representing me properly." The court told Shaw to provide the photos he was referencing to Connelly and reprimanded Shaw, stating, "You are not going to continue every time you walk into this room, to tell me I want to represent myself, I want to get rid of him. [¶] … [¶] He is representing you. We start trial tomorrow. Shaw then returned to his complaint that Connelly had not filed another section 995 motion. The court asked Shaw to stop yelling and reminded Shaw that Connelly had filed a section 995 motion, and that he had ruled in Shaw's favor on various other matters.

Shaw replied, "It's this relationship, it's deteriorated. This [is] past reconcile. I don't see this going forward with him. This attorney needs to be out of here, not me. This is my – this is – I'm the defendant in my – I have to prove my innocence. Me, not him. He's not doing it trying to have fetal-alcohol syndrome. That don't got shit to do with them lying on me." Shaw repeated several times that he did not want Connelly representing him, and the court explained to Shaw that Connelly would cross-examine the victims on Shaw's claims that his encounters with them were consensual. After this interaction, the court continued the hearing, ruling on the parties' evidentiary objections, discussing the witnesses, voir dire, and the court's statements to the jurors once they were empaneled. The court then excused

15

the prosecutor to conduct a *Marsden* hearing and at the conclusion of that hearing again denied Shaw's *Marsden* motion.[2]

B

*Legal Standards*

" 'The United States Supreme Court has made clear that a criminal defendant has a federal constitutional right to represent himself if he voluntarily and intelligently so chooses. (*Faretta, supra*, 422 U.S. at pp. 835–836.) A trial court must grant a defendant's request for self-representation if

---

[2] On the sixth day of trial, May 1, 2024, Shaw was not present and the court exercised its discretion to proceed with trial. The following day, Shaw explained he was absent because "I'm … having suicidal thoughts because this is my life on the line. And when I met you, you talked me out of having my waiver to represent myself. You promised me a fair trial. And I'm not receiving that having [Connelly] represent me." The court responded Shaw was receiving a fair trial, Connelly was representing him "very, very well," and the court intended to proceed with trial even if Shaw decided not to attend. The court then proceeded to address Shaw's motion to dismiss the case under section 1118 and, as discussed, the court granted the motion in part, dismissing counts 9 and 13, and the section 12022.7, subdivision (e) allegations for counts 11, 12, and 14.

At the start of the next and final day of trial, May 3, 2024, Shaw again requested a *Marsden* hearing. Shaw repeated an assertion he made in several prior *Marsden* hearings that Connelly had made a sexual advance toward him at the preliminary hearing. Shaw also stated that because he had made this allegation, Connelly had "been strategically trying to ruin [Shaw's] life." Shaw then said he was going to tell the jury that Connelly was harming him and threatened to kill himself in front of the jury. Shaw also said the court's refusal to appoint another attorney was causing him to be suicidal. This prompted the court's deputy to remove Shaw from the courtroom. After he was removed from the courtroom, Shaw continued to threaten to kill himself, hit his head repeatedly against a wall, and tried to fight with the deputies that were restraining him. As a result, the court again proceeded with the trial that day in Shaw's absence. Shaw returned to court the following and final trial day, and testified in his own defense.

the request is made within a reasonable time prior to the commencement of trial, is unequivocal, and is made voluntarily, knowingly, and intelligently.' " (*People v. Frazier* (2024) 16 Cal.5th 814, 843, cert. den. *sub nom. Frazier v. California* (2025) 145 S.Ct. 1186.)

"On appeal, a reviewing court independently examines the entire record to determine whether the defendant knowingly and intelligently invoked his right to self-representation." (*People v. Doolin* (2009) 45 Cal.4th 390, 453.) The appellate court reviews whether the defendant clearly stated the request for self-representation and whether his conduct and words reflect unambiguity. (*People v. Marshall* (1997) 15 Cal.4th 1, 23 (*Marshall*).) A *Faretta* " 'motion made out of a temporary whim, or out of annoyance or frustration, is not unequivocal—even if the defendant has said he or she seeks self-representation.' " (*People v. Stanley* (2006) 39 Cal.4th 913, 932 (*Stanley*); see also *Marshall,* at p. 21 ["a court 'properly may deny a request for self-representation that is a "momentary caprice or the result of thinking out loud" ' "].) " 'Equivocation, which sometimes refers only to speech, is broader in the context of the Sixth Amendment, and takes into account conduct as well as other expressions of intent.' " (*Stanley,* at p. 932.) " '[T]he right of self-representation is waived unless defendants articulately and unmistakably demand to proceed *pro se.*' " (*Marshall,* at p. 21.)

Further, "the right of self-representation is not a license to abuse the dignity of the courtroom, but a right that can be lost through deliberate, serious misconduct." (*Marshall, supra*, 15 Cal.4th at p. 20.) "[S]ome assertions of the right of self-representation may be a vehicle for manipulation and abuse. It is not only the stability of judgments that is at stake, however, when we require a defendant to make an unequivocal request for self-representation. The defendant's constitutional right to the effective

17

assistance of counsel also is at stake—a right that secures the protection of many other constitutional rights as well." (*Id*. at pp. 22–23.) In addition, the fact that a defendant did not renew a request to represent himself may also be considered as relevant to whether the *Faretta* motion was unequivocal. (*Stanley, supra*, 39 Cal.4th at p. 933; *People v. Tena* (2007) 156 Cal.App.4th 598, 610 (*Tena*).)

Thus, a "court faced with a motion for self-representation should evaluate not only whether the defendant has stated the motion clearly, but also the defendant's conduct and other words. Because the court should draw every reasonable inference against waiver of the right to counsel, the defendant's conduct or words reflecting ambivalence about self-representation may support the court's decision to deny the defendant's motion. A motion for self-representation made in passing anger or frustration, an ambivalent motion, or one made for the purpose of delay or to frustrate the orderly administration of justice may be denied." (*Marshall, supra*, 15 Cal.4th at p. 23.)

If the defendant is found to have invoked the right to self-representation, the trial court's denial of the request is reviewed for abuse of discretion. (*People v. Welch* (1999) 20 Cal.4th 701, 735.) The court's decision is given deference and " 'will not be disturbed in the absence of a strong showing of clear abuse.' " (*Id*. at p. 735.) However, " '[i]n determining on appeal whether the defendant invoked the right to self-representation, we examine the entire record de novo.' " (*People v. Danks* (2004) 32 Cal.4th 269, 295 (*Danks*).) This court is not bound by the trial court's determination that the defendant unequivocally invoked his right to self-representation. (*People v. Boyce* (2014) 59 Cal.4th 672, 703; see *Marshall, supra*, 15 Cal.4th at p. 24 [reviewing court "examine[s] the entire record to determine whether the

18

invocation of the right of self-representation and waiver of the right to counsel was knowing and voluntary"].)

## C

### *Analysis*

We agree with the parties that the timing of Shaw's request for self-representation, which was 11 days before the trial began, was not alone a sufficient basis to support the court's denial of the request. (See *People v. Windham* (1977) 19 Cal.3d 121, 128 ["when a motion to proceed *pro se* is timely interposed, a trial court must permit a defendant to represent himself upon ascertaining that he has voluntarily and intelligently elected to do so, irrespective of how unwise such a choice might appear to be"].) The record before this court, however, shows Shaw's *Faretta* request was equivocal and the trial court's denial of the request on this basis was appropriate. The facts show that Shaw's request was born out of annoyance and frustration with his counsel's tactical decisions and failure to establish Shaw's innocence before trial. The record reveals not that Shaw wanted to proceed to trial in pro per, but that he was attempting to force the trial court to relieve Connelly from his appointment. (See, e.g., *Stanley, supra*, 39 Cal.4th at p. 932 [a *Faretta* motion made out of a temporary whim, annoyance, or frustration is not unequivocal even if defendant has said he seeks self-representation]; *Danks, supra*, 32 Cal.4th at p. 296 ["defendant's references to self-representation were equivocal, born primarily of frustration regarding the granting of [defense] counsel's requests for continuances and his desire to avoid further psychiatric examination"]; *People v. Wright* (1990) 52 Cal.3d 367, 407–410 [expression of dissatisfaction with attorney in conjunction with other statements about being unrepresented were too equivocal for *Faretta*

19

request], disapproved on other grounds in *People v. Williams* (2010) 49 Cal.4th 405.)

Shaw made his *Faretta* request on April 11, 2024, only after engaging in a tense discussion with the trial court about Connelly's decision not to call Shaw's mother and other unspecified witnesses to the stand in his defense. After Shaw's outburst, the court expressed frustration with his repeated efforts to have Connelly fired and his inability to understand that he was well-represented. This triggered Shaw's initial angry response to the court that he could "go pro per." After the court continued to explain that Shaw needed to work with Connelly to prepare his defense, Shaw again erupted that Connelly had not sufficiently attempted to have the case dismissed before trial and that he wanted to represent himself. These statements do not show an unambiguous request to proceed without counsel. Rather, the context here shows a request made in anger and frustration, and fear, about the proceedings. Shaw's request was an "impulsive reaction[] to his frustrated attempts to secure an attorney who would subpoena the witnesses he desired, rather than [an] unequivocal *Faretta* request[]." (*Tena, supra*, 156 Cal.App.4th at p. 608; see *Marshall, supra*, 15 Cal.4th at p. 21 ["[T]he high court's emphasis in *Faretta* … on defendant's knowing, voluntary, unequivocal, and competent invocation of the right [to self-representation] suggests that an insincere request or one made under the cloud of emotion may be denied"].)

The proceedings leading up to the April 11, 2024 readiness conference further support a finding that Shaw's request was equivocal. Just two months prior to the conference, Shaw withdrew his previous request for self-representation, which had been granted a month earlier, and accepted

20

reappointment of counsel. Shaw, thus, recognized the risks of self-representation and made a reasoned decision to proceed to trial *with counsel.*

The proceedings following the April 11, 2024 hearing also show equivocation in Shaw's request for self-representation. Contrary to Shaw's assertion, he did not make a "renewed" request for self-representation. Rather, Shaw only expressed dissatisfaction with Connelly's performance and asked for substitute counsel. Shaw's failure to renew his request again prior to or during his trial supports our conclusion that his April 11, 2024 *Faretta* request was the result of emotion and frustration, not a genuine desire to represent himself. (*Stanley, supra*, 39 Cal.4th at p. 933 ["once defendant's request for self-representation was denied, he never renewed it. … In light of defendant's subsequent acceptance of several appointed counsel to represent him without ever renewing his request for self-representation, we conclude he must further be found to have ultimately abandoned his desire to invoke his *Faretta* rights in these capital murder proceedings"]; *Tena, supra*, 156 Cal.App.4th at p. 610 [failure to renew his *Faretta* request after the initial denial constituted an abandonment of the request].)

In sum, "[w]hen we examine the record of the hearing at which [Shaw] assertedly invoked his right of self-representation, we conclude that the request was ambivalent in the context of that hearing" and was made in an attempt to have Connelly replaced and to disrupt the proceedings.[3] (*Marshall, supra*, 15 Cal.4th at p. 25.) Accordingly, we reject Shaw's request to reverse the judgment of conviction on this basis.

---

[3] Because we conclude that Shaw failed to invoke his right to self-representation, we do not reach his additional argument that the court erred by failing to assess his mental competency to invoke that right.

21

## II

Shaw also argues the trial court erred by imposing separate punishments for his convictions for torture (count 1) and domestic violence resulting in corporal injury (count 6) because the crimes were part of a continuous course of conduct. The Attorney General responds that although the crimes both occurred over the three-day span that Shaw held Doe against her will, substantial evidence supported the court's implicit finding that the offenses were committed with different intents at different times.

## A

### *Additional Background*

In his closing argument, the prosecutor discussed the relationship history between Shaw and Doe, starting from the date they met to the date Doe obtained the restraining order against Shaw. The prosecutor then moved into the facts supporting each charge involving Doe. When addressing count 6 (domestic violence resulting in corporal injury), the prosecutor stated that on the night of November 4, 2022, Shaw was enraged after Doe received a call from V.R., which triggered Shaw to drive Doe to a remote location and beat her repeatedly, causing bruising and swelling to her face. When addressing count 1 (torture), the prosecutor focused on Shaw's act of forcibly removing Doe's acrylic fingernails one at a time, causing Doe to suffer excruciating pain and requiring her to wear bandages for a long time after. The prosecutor asserted Shaw inflicted this torture because Doe refused to have sex with him.

In the probation report, the officer stated that the basis of the domestic violence charge in count 6 was Shaw's physical assault on Doe in his car on November 4, 2022. The officer noted Doe received a phone call from V.R. and in response, he headbutted Doe and slapped her in the face. With respect to

22

count 1, the officer stated the basis of the torture charge was the forcible removal of Doe's fingernails on November 6, 2022. In setting forth sentencing considerations, the probation officer concluded section 654 did not apply to the counts involving Doe because counts 1 through 2 and counts 6 through 8 involved separate criminal acts. With respect to concurrent or consecutive sentencing, the officer recommended consecutive sentencing because "the crimes were committed at separate places rather than being committed so closely in time and place as to indicate a single period of aberrant behavior."

At the sentencing hearing, the parties did not address the applicability of section 654 to count 1, and both parties agreed that sentencing for count 6 was not subject to a stay pursuant to section 654. When discussing which of Shaw's acts were the basis for count 6, both parties and the court referenced Shaw's beating of Doe in the car on November 4, 2022. The trial court imposed a term of life with the possibility of parole for count 1, and for the remaining counts, it imposed an aggregate determinate term of 13 years and four months, which included a one-year term for count 6.

## B

### *Legal Standards*

Section 654, subdivision (a) provides that "[a]n act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." This provision "precludes multiple punishments for a single act or indivisible course of conduct." (*People v. Hester* (2000) 22 Cal.4th 290, 294.) With respect to whether section 654 applies to preclude multiple punishments, a course of conduct is generally

23

indivisible if the defendant harbored a single criminal objective the entire time.  (*People v. Gaio* (2000) 81 Cal.App.4th 919, 935.)

" 'Whether a course of criminal conduct is divisible ... depends on the intent and objective of the actor.'  [Citations.]  '[I]f all the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once.'  [Citation.]"  [Citation.]'  [Citations.] However, if the defendant harbored 'multiple or simultaneous objectives, independent of and not merely incidental to each other, the defendant may be punished for each violation committed in pursuit of each objective even though the violations share common acts or were parts of an otherwise indivisible course of conduct.' "  (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)  In addition, " 'a finding that multiple offenses were aimed at one intent and objective does not necessarily mean that they constituted "one indivisible course of conduct" for purposes of section 654.  If the offenses were committed on different occasions, they may be punished separately.' "  (*People v. Cruz* (2020) 46 Cal.App.5th 715, 736–737 (*Cruz*).)

"The trial court has broad latitude in determining whether section 654, subdivision (a) applies in a given case."  (*People v. Garcia* (2008) 167 Cal.App.4th 1550, 1564.)  "When a trial court sentences a defendant to separate terms without making an express finding the defendant entertained separate objectives, the trial court is deemed to have made an implied finding each offense had a separate objective."  (*People v. Islas* (2012) 210

24

Cal.App.4th 116, 129.)  Such findings will be upheld on appeal if supported by substantial evidence.  (*Ibid.*)

C

*Analysis*

Shaw argues he intended to harm Doe when he beat her up in the car and again when he forcibly peeled off her fingernails at the motel, and thus his intent was "identical" in both crimes and the punishment for count 6 should be stayed under section 654.  This argument is not well taken.

When Shaw beat Doe in the car on November 4, 2022, he did so immediately after Doe received a phone call from her ex-girlfriend.  His reaction to the call showed an intent to punish or scare Doe for her relationship with V.R.  When Shaw later tortured Doe by removing her fingernails at the motel on November 6, 2022, he did so after Doe refused to have sex with him and refused to comply with his demand to remove her jewelry.  This suggests Shaw's intent was to punish Doe for refusing his sexual advance and reestablish control over her.  Based on the circumstances surrounding each offense, there was sufficient evidence to support a finding that Shaw's intent in removing Doe's acrylic fingernails was distinct from his intent to beat her in the car two days earlier. (See *People v. Mejia* (2017) 9 Cal.App.5th 1036, 1047 [affirming imposition of separate sentences for criminal threats and torture that were related, but where there was evidence of separate intents].)

Further, even assuming Shaw harbored the same intent for both crimes—i.e., the intent to harm Doe—he is still not entitled to a stay under section 654 because the crimes were divisible in time.  (*Cruz, supra*, 46 Cal.App.5th at pp. 736–737.)  The infliction of corporal injury, which the parties agreed was the basis for count 6, occurred two days before the torture

25

of removing Doe's fingernails, the basis for count 1.  Because the criminal acts underlying counts 1 and 6 were temporally separated by almost two days, the court appropriately concluded section 654 did not apply to stay the punishment for count 6.

DISPOSITION

The judgment is affirmed.

McCONNELL, P. J.

WE CONCUR:

KELETY, J.

CASTILLO, J.